MARY BROWN, ET AL.

V.

WILLIAM L. LUKHARD, ETC., ET AL.

Record No. 821058

Decided April 26, 1985, at Richmond

Present: All the Justices

*Jill A. Hanken (Gregory E. Lucyk; Henry W. McLaughlin, III; Virginia Poverty Law Center*, on briefs), for appellants.
*John A. Rupp, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this declaratory judgment proceeding in equity, recipients of Aid to Dependent Children (ADC) benefits seek adjudication that a State departmental regulation was invalid because it violated legislative enactments. The basic question is whether certain statutory provisions, when read with portions of a biennial appropriations act, are clear and unambiguous, thus precluding use of unpublished legislative history to construe the enactments.

The ADC program is a joint federal-state effort established under the Social Security Act to provide funds to children of indigent families. In Virginia, the program is administered by the Department of Welfare under the Virginia Public Welfare and Assistance Law. Code §§ 63.1-86 to -133.1.

The bill of complaint in this proceeding was filed June 30, 1981. At that time, Code § 63.1-105 provided, in part: "A person shall be eligible for aid to dependent children if he: (a) Has not attained the age of eighteen years, or, if regularly attending school, has not attained the age of twenty-one years; . . . ."[1]

---

[1] At the time this controversy arose, the entire statute provided:

"**§ 63.1-105. Eligibility for aid to dependent children.** — A person shall be eligible for aid to dependent children if he:

(a) Has not attained the age of eighteen years, or, if regularly attending school, has not attained the age of twenty-one years;

(b) Is a resident of Virginia;

318

The 1981 General Assembly appropriated over $171 million to the Department of Welfare for the ADC program. 1981 Acts, ch. 601 at 1101. The entry for ADC appears in the following portion of the Appropriations Act under Item 498:

| Item | | Information References($) First Year | Second Year | Appropriations($) First Year | Second Year |
|---|---|---|---|---|---|
| 498. | Temporary Income Supplement Services (4520000) . . . . . . . . . . . | | | ~~$183,832,800~~ $194,588,800 | ~~$191,503,700~~ $197,531,920 |
| | Aid to Dependent Children (4520100) . . . . . . . . . . . . . . . . | $169,364,000 | ~~$174,392,700~~ $171,656,120 | | |
| | General Relief (4520300) .. . . . . . . . . . . . . . . . . . . . | $7,319,800 | $7,685,800 | | |
| | Resettlement Assistance (4520400) . . . . . . . . . . . . . . . . | ~~$3,149,000~~ $11,905,000 | ~~$3,225,200~~ $12,190,000 | | |
| | Emergency Assistance (4520600) . . . . . . . . . . . . . . . . . . | $6,000,000 | $6,000,000 | | |

The Act contains no language restricting the expenditures of ADC funds.

On May 21, 1981, after enactment of the Appropriations Act and before it became effective on July 1, the State Board of Welfare adopted a statewide ADC policy change which it felt implemented action of the General Assembly. The Board believed that the legislature demonstrated in the Appropriations Act an intent to "defund" ADC coverage for students between the ages of 18 and 21. Thus, the new policy terminated such benefits for that category of recipients effective July 1, 1981.

(c) Is deprived of parental support or care by reason of the death, continued absence from home, or physical or mental incapacity of a parent;

(d) Is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece in a place of residence maintained by one or more of such relatives as his or their own home or is in placement under conditions specified by the State Board; and

(e) Is in need of public assistance.

Notwithstanding the provisions of subparagraph (c) above, the State Board may determine, by rule and regulation, the conditions under which a child who is deprived of adequate support by reason of the unemployment of one or both of his parents shall be eligible for aid and assistance under this chapter if all other eligibility requirements have been met. The welfare of the child shall be the paramount consideration and the presence of an unemployed parent in the home shall not in and of itself deprive such child of necessary aid and assistance under this chapter."

While having no direct bearing on the legal question presented here, the General Assembly in 1982 amended subsection (a) to read: "Has not attained the age of eighteen years, or, if regularly attending a secondary school or in the equivalent level of vocational or technical training, has not attained the age of nineteen years and is reasonably expected to complete his senior year of school prior to attaining age nineteen; . . . ." Acts 1982, ch. 386.

Upon being notified of the new regulation, six recipients of such benefits joined as plaintiffs in this suit against the Director of the Department of Welfare and the members of the State Board of Welfare (hereinafter collectively, the Department). The plaintiffs alleged they qualified for receipt of continued ADC payments under the statutory provision retaining ADC eligibility in those persons 18 to 21 years of age "regularly attending school." Asserting the Department's action terminating their entitlement to ADC violated Code § 63.1-105, the plaintiffs sought a temporary and permanent injunction suspending the Department's regulation and sought an adjudication that they were entitled to continued payments of ADC.

After a hearing on June 30, the trial court denied the request for a temporary injunction. Subsequently, motions for summary judgment were filed in 1981 by the opposing parties.[2] The trial court, relying on legislative history introduced over the plaintiffs' objections, found in favor of the Department in a February 1982 letter opinion.

Reviewing the legislative budgeting process, and noting its "complexity," the chancellor ruled "that the figures in the budget are not clear and unambiguous and therefore other evidence can be considered to determine the will of the General Assembly . . . ." The trial court placed special emphasis on one of the Department's exhibits, a legislative document which was part of the 1981 budgeting process and which dealt with a senator's proposed amendment, ultimately adopted, to Item 498 of the budget. The proposal reduced the original, second-year ADC appropriation contained in the 1980 biennial budget. Noted at the foot of the preprinted legislative form under "Justification For Request," was the following:

"This amendment would reduce funding for Aid to Dependent Children (ADC) in the second year. Welfare payments under ADC would be terminated for 3,283 dependent children aged 18-21 who are in school. Presently, dependent children aged 18-21 who are *not* in school are *not* covered under ADC."

---

[2] Rule 2:21, permitting summary judgment in equity, did not become effective until July 1, 1983. No issue has been made of the procedure employed and we will merely note the irregularity.

The trial court determined from the testimonial and documentary evidence that all members of the House and Senate were aware of the foregoing explanatory note to the Senate amendment at the time the Budget Bill was adopted by the General Assembly. The trial court aptly stated: "The problem in this case arises because the explanatory note contained in the Senate amendment was not carried forward into the [Appropriations] Act and voted upon finally by both the House and Senate." Relying on the extrinsic evidence to interpret the ambiguous item in the Appropriations Act, the court below decided it was "apparent that the General Assembly did not appropriate any funds that would benefit the plaintiffs in this case." Accordingly, the court ruled that "no money can be paid to the Welfare Department to fund the program that would benefit the plaintiffs." The plaintiffs appeal from the March 1982 final order sustaining the Department's motion for summary judgment.

On appeal, the plaintiffs argue that Code § 63.1-105(a) mandates ADC eligibility for 18 to 21-year-old students who are otherwise qualified. According to the plaintiffs, use of the word "shall" in § 63.1-105(a) imposes an obligation on the Department to pay ADC benefits to the plaintiffs when eligibility is proven. Plaintiffs point to the following provisions of Code § 63.1-109: "Upon completion of the investigation the local board shall determine whether the applicant is eligible for assistance under this law, and, if eligible, the amount of such assistance and the date upon which such assistance shall begin." Plaintiffs say that use of the word "eligible" in this section directly relates to those persons defined as "eligible" under § 63.1-105. Thus, plaintiffs contend, because they were "eligible" for ADC on July 1, 1981 under § 63.1-105, they were entitled to the payment of benefits at that time under § 63.1-109. In sum, plaintiffs argue: "Once eligibility is established, ADC benefits must be paid."

The Department contends that § 63.1-105(a) does not mandate payment for 18 to 21-year-old students but that payment of benefits depends upon the Appropriations Act. Thus, according to the argument, § 63.1-105 and § 63.1-109 merely enable the Department to pay such benefits if the General Assembly in fact provides an appropriation to the Department for those individuals who are eligible. We will agree with the Department and assume, without deciding, that the foregoing statutes are mere enabling statutes rather than mandatory.

Continuing, the Department does not contend that § 63.1-105, standing alone, is ambiguous. It argues, however, that the pertinent portions of the Appropriations Act affecting the provisions of the statute are unclear and ambiguous. While recognizing that the appropriation plainly indicates the legislature intended a reduction in "some" ADC program benefits, the Department says "it is unclear as to which benefits were to be eliminated." The Department notes that "Item 498 contains a subject heading, 'Aid to Dependent Children,' and two figures under the 'Second Year' column, with one figure lined out, indicating a total cut of slightly less than $3 million." The Department says the appropriation "contains the number '4520100' which, on its face, is not explained." Thus, the argument continues, the trial court properly relied on extrinsic legislative history to cure the ambiguity, "particularly in view of the fact that the number '4520100' in Item 498 is a cross-reference to the Senate amendment which explains the reduction in the ADC appropriation." We reject the contention that the appropriation is ambiguous.

Language is ambiguous if it admits of being understood in more than one way or refers to two or more things simultaneously. *Lincoln National Life Ins. Co.* v. *Commonwealth Corrugated Container Corp.*, 229 Va. 132, 136-37, 327 S.E.2d 98, 101 (1985). An ambiguity exists when the language is difficult to comprehend, is of doubtful import, or lacks clearness and definiteness. *Ayres* v. *Harleysville Mut. Casualty Co.*, 172 Va. 383, 393, 2 S.E.2d 303, 307 (1939). If language is clear and unambiguous, there is no need for construction by the court; the plain meaning and intent of the enactment will be given it. *School Board of Chesterfield County* v. *School Board of the City of Richmond*, 219 Va. 244, 250, 247 S.E.2d 380, 384 (1978). When an enactment is clear and unequivocal, general rules for construction of statutes of doubtful meaning do not apply. *Id.* at 250-51, 247 S.E.2d at 384. Therefore, when the language of an enactment is free from ambiguity, resort to legislative history and extrinsic facts is not permitted because we take the words as written to determine their meaning. *City of Portsmouth* v. *City of Chesapeake*, 205 Va. 259, 269, 136 S.E.2d 817, 825 (1964). And, when an enactment is unambiguous, extrinsic legislative history may not be used to create an ambiguity, and then remove it, where none otherwise exists. *See Cohan* v. *Thurston*, 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982).

■ The meaning of the ADC portion of the appropriation is clear. It is not difficult to comprehend. It does not lack definiteness. It does not refer to two or more things simultaneously. Manifestly, in the second year of the biennium, the amount funded for Aid to Dependent Children has been reduced by almost $3 million. The Department says, however, that the reduced appropriation is unclear because "there are no specific words" describing the legislature's intent behind the budget reduction and explaining "which benefits were to be eliminated." But, as the plaintiffs argue, the mere fact that Item 498 does not contain restrictions or explanations does not render the appropriation ambiguous or unclear. Item 498 clearly appropriates $171,656,120 to the ADC program for the second year of the biennium. There is no requirement that the appropriation furnish any further direction to the Department for operation of the ADC program. The only requirement is that the Department administer the program according to law, including § 63.1-105(a).

■ Likewise, we conclude that the presence of an apparent reference number, "4520100," within the ADC line item does not create an ambiguity and, contrary to the Department's implication, does not automatically incorporate by reference all legislative committee papers carrying that number. Every line of the 296-page budget that appropriates funds includes such a number in parentheses. If we adopted the Department's view, the effect would be to declare every appropriation in the whole budget unclear and to require examination of the extrinsic legislative documents to determine every item's true meaning. We will not embrace such a notion.

Therefore, we hold that the statutes when read with the appropriation in question are clear and unambiguous. The indicated amount was appropriated for eligible ADC recipients during the second year of the biennium. Consequently, the trial court erred in considering extrinsic evidence and in construing the enactments contrary to their plain meaning.

We will reverse the order appealed from and declare that the Department's May 21, 1981 regulation which eliminated ADC eligibility for 18 to 21-year-old students was invalid. In addition, we will remand the suit and direct the trial court to order the Department to award the plaintiffs ADC benefits according to the applicable law as if the foregoing regulation had not been adopted.

*Reversed and remanded.*

POFF, J., dissenting.

I cannot agree with the majority's reasoning. In the construction of legislative enactments, the judicial function is to determine legislative intent and, insofar as it comports with constitutional principles, to give it effect.

I accept the several rules the majority invokes. True, courts "take the words as written to determine their meaning." But numerals are part of the operative language of an appropriation act. If such language "lacks clearness and definiteness", it is ambiguous and begs for clarification. When the legislature "lines out" one numeral and substitutes another, courts must presume that the modification was intentional and meaningful. If the modification "admits of being understood in more than one way", the language of a legislative act is ambiguous and legislative intent is debatable.

One way in which the modification made here can be interpreted is that the legislators intended to reduce the total program funding by $3 million and to pro-rate that reduction among all the members of all the classes of beneficiaries. But it is equally reasonable to conclude that the legislative purpose was to apply the total reduction to a discrete class of recipients.

This inherent uncertainty is heightened by the number "4520100" which appears on the same line of type as the line drawn through the original appropriation figure. That number is a part of the language of the appropriation act. Appearing, as it does, juxtaposed against the modification, it is not superfluous. It cannot be ignored. It meant *something* to the authors who wrote it into the document, and the trial judge could not assume that it meant *nothing* to the legislators who adopted the act. Yet, in order to consider the issues joined and to "declare" legislative intent, he was required to decide what it meant.

His decision could be made only by resort to evidence of legislative history. The evidence adduced gave meaning to "words as written" which, otherwise, were bereft of meaning. Only then was he able to decide that the legislative intent underlying the modification was to apply the full amount of the budget reduction to a single class of beneficiaries.

I believe that the legislative language was ambiguous as that word is defined by the majority, that the evidence of legislative history resolved all doubt about the legislative purpose, and that the judgment should be affirmed.

CARRICO, C.J., joins in dissent.