## CIRCUIT COURT OF THE CITY OF RICHMOND

Virginia Jockey Club, Inc.

v.

Virginia Racing Commission

May 23, 1995

Case No. HE-1266-4

BY JUDGE RANDALL G. JOHNSON

This is an appeal from a decision of the Virginia Racing Commission which awarded licenses to own and operate a horse racing facility to two entities controlled by Donald W. Stansley. Appellant is Virginia Jockey Club, Inc., one of the five unsuccessful applicants for such licenses. No other applicant appealed.

The Virginia Racing Commission was created by the General Assembly in 1988 as part of the legislation allowing horse racing with pari-mutuel betting in Virginia. The Commission is vested with "control of all horse racing with pari-mutuel wagering in the Commonwealth, with plenary power to prescribe regulations and conditions under which such racing and wagering shall be conducted, so as to maintain horse racing in the Commonwealth of the highest quality and free of any corrupt, incompetent, dishonest or unprincipled practices and to maintain in such racing complete honesty and integrity." Va. Code § 59.1-364(A). The statute goes on to state that "[t]he conduct of any horse racing with pari-mutuel wagering participation in such racing or wagering and entrance to any place where such racing or wagering is conducted is a privilege which may be granted or denied by the Commission or its duly authorized representatives in its discretion in order to effectuate the purposes set forth in this chapter." Va. Code § 59.1-364(B).

As part of its function as described above, the Commission is authorized to issue two types of licenses with regard to racetracks and locations for pari-mutuel betting: owners' licenses and operators' licenses. An owner's license allows the holder to "construct or own a horse racetrack or satellite facility where pari-mutuel wagering is permitted . . . ." Va. Code § 59.1-377(A). An operator's license allows the holder to "hold a race meeting or operate a satellite facility . . . ." Va. Code § 59.1-381(B). This appeal involves the issuance of both types of licenses.

In 1993, the Commission began accepting applications for owners' and operators' licenses. Six entities, including appellant, applied. One of the applicants was "Stansley Management, L.P.," which later changed its name to "Colonial Downs, L.P." On October 12, 1994, the Commission awarded an owner's license to Colonial Downs, L.P., and an operator's license to Stansley Racing Corp., a corporation which, as will be discussed in more detail later, was formed by Donald Stansley after the October 1, 1993, application deadline but during the Commission's investigation and deliberation process. The applications of all other applicants were denied. This appeal followed.

In an earlier ruling, the court held that the present appeal is not governed by the Administrative Process Act (APA), Va. Code § 9-6.14:1 *et seq.*, even though the Racing Commission is clearly an "instrumentality . . . of the state government empowered by the basic laws to make regulations or decide cases" (Va. Code § 9-6.14:4(A)), and even though the Commission itself declared that its decision was rendered pursuant to that Act. *See* Case Decision, at 1. The court's ruling was based on several grounds. First, while the APA provides that specified persons "shall have a right of the direct *review*" of agency actions (Va. Code § 9-6.14:16(A) (emphasis added)), persons aggrieved by actions of the Racing Commission may "*appeal.*" Va. Code § 59.1-373. Second, venue for review under the APA is set out in Va. Code § 8.01-261(1), and includes a variety of venue options. Appeals of Racing Commission actions *must* be filed in this court. Va. Code § 59.1-373.

Third, under the APA, the burden is on the party complaining of agency action to "designate and demonstrate an error of law subject to review by the court," and examples of such errors of law are specifically set out in the APA. Va. Code § 9-6.14:17. In appeals from the Racing Commission, the only issue is whether the action of the Commission was "arbitrary." Va. Code § 59.1-373. Fourth, while the General Assembly has given the Supreme Court of Virginia specific authority for establishing the manner

by which review of agency action under the APA is to be conducted, including time limits for filing notices and petitions for appeal (*see* Va. Code § 9-6.14:16(A)), § 59.1-373 mandates that appeals from the Racing Commission be taken "within thirty days" of Commission action. In sum, the court was of the opinion when it made its earlier decision on this issue that the above differences between provisions of the APA and provisions of the statute applicable to the Racing Commission are so substantial as to preclude coverage by the APA of this appeal. The court adheres to that decision now.

The court also adheres to its decision not to allow discovery under Part Four of the Rules of the Supreme Court of Virginia and not to allow the presentation of evidence. As already noted, this is an "appeal," and discovery and presentation of evidence are not allowed on appeal.

Turning now to the appeal itself, appellant challenges the Commission's award of the subject licenses on three grounds. First, appellant argues that both Colonial Downs, L.P., and Stansley Racing Corp. are ineligible, as a matter of law, to hold the licenses awarded. Second, appellant argues that the evidence in the record fails to support critical findings upon which the award was based. And third, appellant contends that it was denied fundamental fairness because the Commission "secretly consider[ed] critical evidence outside of the administrative record." *See* Opening Brief of Virginia Jockey Club, Inc., at 26. Each of these grounds will be considered in turn.

### 1. *Eligibility for Licenses*

Appellant's contention that Colonial Downs, L.P., and Stansley Racing Corp. are legally ineligible to hold the licenses awarded to them can be further divided into two arguments. First, appellant claims that only corporations can be owners or operators under the relevant statutes, thereby disqualifying limited partnerships such as Colonial Downs, L.P. Second, appellant contends that Stansley Racing Corp. never applied for any license at all and is therefore ineligible to hold one. The court rejects both arguments.

With regard to whether only corporations can be owners and operators, Va. Code § 59.1-378(C), which governs the issuance of owners' licenses, provides:

C. The Commission *shall* deny a license to any applicant *unless it finds*:

1. That, if the corporation is a stock corporation, that such stock is fully paid and nonassessable, has been subscribed and paid for only in cash or property to the exclusion of past services, and, if the corporation is a nonstock corporation, that there are at least twenty members;

2. That all principal stockholders or members have submitted to the jurisdiction of the Virginia courts, and all nonresident principal stockholders or members have designated the Executive Secretary of the Commission as their agent for receipt of process;

3. That the applicant's articles of incorporation provide that the corporation may, on vote of a majority of the stockholders or members, purchase at fair market value the entire membership interest of any stockholder or require the resignation of any member who is or becomes unqualified for such position under § 59.1-379; and

4. That the applicant meets the criteria established by the Commission for the granting of an owner's license.

Emphasis added.

Ostensibly even more emphatic is § 59.1-382, which deals with the issuance of operators' licenses, and which provides, in pertinent part:

The Commission *shall deny* a license to any applicant, *unless it finds:*

1. That such applicant is a corporation organized under Title 13.1 or comparable law of another state, and qualified to do business in Virginia;

2. That, if the corporation is a stock corporation, all principal stockholders have submitted to the jurisdiction of the Virginia courts and all nonresident principal stockholders have designated the Executive Secretary of the Commission as their agent for process, and further, that an application shall also contain information as required by § 59.1-377;

3. That the applicant's articles of incorporation provide that the corporation may, on vote of a majority of the stockholders or members, purchase at fair market-value the entire membership interest of any stockholder, or require the resignation of any member, who is or becomes unqualified for such position under § 59.1-379 . . . .

Emphasis added.

In spite of the seemingly clear statements contained in the above statutes, particularly the statement in § 59.1-382 that an operator's license "*shall*" be denied "*unless*" the applicant "*is a corporation*," the court concludes that such statements cannot be read literally.

This court is well aware of our Supreme Court's repeated admonitions against judicial "interpretation" of statutes which need no interpretation. *See, e.g., Moore v. Gillis*, 239 Va. 239, 241, 389 S.E.2d 453 (1990) ("If statutory language is clear and unambiguous, there is no need for construction by the court; the plain meaning and intent of the enactment will be given it . . . . When an enactment is clear and unequivocal, general rules of construction of statutes of doubtful meaning do not apply.") (*quoting Brown v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84 (1985)). A reading of all of the statutes involved here, however, convince this court not only that the seemingly clear statements set out above *are* ambiguous, but that they are also wrong.

Va. Code § 59.1-365, which contains the definitions for the chapter dealing with horse racing and pari-mutuel betting, defines "person" as follows:

> "*Person*" includes a natural person, partnership, joint venture, association, or corporation.

Section 59.1-377 provides, in part:

> § 59.1-377. *Application for owner's license.* — A. Any *person* desiring to construct or own a horse racetrack or satellite facility where pari-mutuel wagering is permitted shall file with the Commission an application for an owner's license.

Emphasis added.

Similarly, § 59.1-381 provides, in part:

> § 59.1-381. *Application for operator's license.* — A. Any *person* desiring to hold a race meeting or operate a satellite facility shall file with the Commission an application for an operator's license.

Emphasis added.

It makes absolutely no sense to allow "*persons*" to apply but to make awards only to corporations.

There are other reasons why the subject statutes do not say what they appear to say. For example, § 59.1-371 provides:

§ 59.1-371. *Fingerprints and background investigations.* -- The Commission shall fingerprint and require a background investigation to include a criminal history record information check of the following persons to be conducted by a representative of a law-enforcement agency of the Commonwealth or federal government: (i) *every person licensed to hold race meetings within the Commonwealth of Virginia*; (ii) every person who is an officer or director or principal stockholder of a corporation which holds such a license, and every employee of the holder of any such license whose duties relate to the horse racing business in Virginia; (iii) all security personnel of any license holder; (iv) members and employees of the Virginia Racing Commission; (v) all permit holders, owners, trainers, jockeys, apprentices, stable employees, managers, agents, blacksmiths, veterinarians, employees of any license or permit holder; and (vi) any person who actively participates in the racing activities of any license or permit holder.

Emphasis added.

Since a "person" *must* have an operator's license to "hold race meetings" in the Commonwealth (Va. Code § 59.1-375), and since corporations obviously cannot be fingerprinted, subsection (i) of the above statute has absolutely no meaning unless natural persons can be licensed. Indeed, such interpretation makes perfect sense; this is, subsection (i) covers natural-person licensees, subsection (ii) covers corporations, and subsection (v) ("all . . . owners [and] employees of a license or permit holder") covers all other entities included in § 59.1-365's definition of "person" — partnerships, joint ventures, and associations.[1]

Next, § 59.1-377, a portion of which is set out above, and which governs the issuance of owners' licenses, goes on to state:

Such application shall be filed at the time and place prescribed by the Commission, and shall be in such form and contain such information as prescribed by the Commission, including but not limited to the following:

---

[1] Section 59.1-365 defines "licensee" as "any *person* holding an owner's, operator's, or limited license under §§ 59.1-375 through 59.1-386 of this chapter," and "permit holder" as any *person* holding a permit to participate in any horse racing . . . ." Emphasis added.

1. The name and address of such person; *if a corporation*, the state of its incorporation, the full name and address of each officer and director thereof, and if a foreign corporation, whether it is qualified to do business in this Commonwealth; *if a partnership or joint venture, the name and address of each officer thereof*;

2. The name and address of each stockholder or member of such corporation, *or each partner of such partnership or joint venture*, and of each person who has contracted for a pecuniary interest in the applicant or the enclosure where race meetings or pari-mutuel wagering will be conducted, whether such interest is an ownership or a security interest, and the nature and value of such interest, and the name and address of each person who has agreed to lend money to the applicant . . . .

Emphasis added.

These provisions, as well as the provisions defining "person," allowing "persons" to apply for licenses, and requiring that licensees be fingerprinted, are totally inconsistent with appellant's claim that only corporations can be licensed. Moreover, all of these provisions are, in the court's view, a clearer indication that the General Assembly intended that entities other than corporations *can* be licensed than are the provisions relied on by appellant indications that they cannot be. Indeed, simply by adding the word "corporate" to the first sentence of § 59.1-378(c), thusly — "The Commission shall deny a license to any *corporate* applicant unless it finds" — and the phrase "if a corporation" to § 59.1-382(1), (2), and (3), all of the provisions discussed above would be reconciled and have meaning. On the other hand, in order to give meaning to the literal corporation requirement language urged by appellant, the definitions of "person," "licensee," and "permit holder" in § 59.1-365, the fingerprint requirement of § 59.1-371(i), the "if a partnership or joint venture" language in § 59.1-377(1) and (2), and the general invitation to "any person" to apply for licenses would all have to be stricken or ignored. Such a result is simply untenable. Appellant's argument that only corporations can hold owners' and operators' licenses is rejected.[2]

---

[2] The court can also envision serious equal protection challenges under the Fourteenth Amendment to the United States Constitution and "special legislation" challenges under Article IV, § 14, of Virginia's Constitution if ownership and operation of horse racetracks and betting locations were denied to all entities except corporations. Of course, in light

The court now turns to the second part of appellant's argument concerning the "legal ineligibility" of one of the present licensees. As noted earlier, one of the applicants for an owner's license and an operator's license was Stansley Management, L.P. That entity later changed its name to Colonial Downs, L.P., and it was Colonial Downs, L.P., that was awarded the owner's license. Other than appellant's argument discussed above, that a limited partnership cannot be an owner, appellant makes no argument that the change of name disqualified Colonial Downs, L.P., from being licensed. Appellant does argue, however, that the entity which was awarded the operator's license, Stansley Racing Corp., is ineligible, and that it is ineligible because it never applied.

The court agrees with appellant that under normal circumstances it would be totally improper and a cause for reversal if an entity which did not apply for licensure received a license. Obviously, one of the primary reasons for the lengthy and detailed application process prescribed by statute is to allow the Commission to fully investigate and consider the precise entities which may be licensed to carry on horse racing and betting in the Commonwealth so as to ensure, as much as possible, that Virginia horse racing will to be of the "highest quality and free of any corrupt, incompetent, dishonest or unprincipled practices and to maintain in such racing complete honesty and integrity." Va. Code § 59.1-364(A). This cannot be done if one entity is allowed to apply for another, or if an applicant is actually a "front" for someone else. In fact, § 59.1-375 specifically prohibits the transfer of any license issued by the Commission. The court concludes, however, that the circumstances of this application process were not normal.

The deadline for submitting applications was October 1, 1993. By letter to the Racing Commission dated May 23, 1994, counsel for Stansley Management, L.P., informed the Commission of the formation of Stansley Racing Corp., which would be owned by Mr. Stansley and James Leadbetter, exactly the same persons who made up Stansley Management, L.P., and Colonial Downs, L.P. Further, the letter stated:

> Accordingly, the operator of the facility *will be a corporation* in compliance with the requirement of § 59.1-382(1) of the Code of Virginia ["The Commission shall deny a license to any appli-

---

of the ruling made, the court expresses no opinion on the likely outcome of such challenges.

cant, unless it finds: 1. That such applicant is a corporation
. . . ."].

Record at 1397 (emphasis added).

The court concludes that the formation of Stansley Racing Corp. was simply an attempt by Stansley Management, L.P., to comply with what it thought — indeed, what appellant now claims — was required by statute. The court also concludes, having reviewed the subject application, that absolutely nothing else changed. The same people who owned Stansley Management, L.P., now own Stansley Racing Corp., and they own it in the same percentages — Stansley 70%, Leadbetter 30% — as they always have. It would be unfair to the applicant, and a complete waste of time for the Commission, for the court to require the Commission to repeat the application or selection process simply because the successful applicant was trying to comply with what the court has now found was poor draftsmanship by the legislature. The process need not be repeated.

It is clear from the record that the Commission had all of the facts before it necessary to render its decision. There were no "silent" partners or absent applicants. Stansley Management, L.P., Colonial Management, L.P., Stansley Racing Corp., Mr. Stansley, and Mr. Leadbetter were not "fronting" for some "shady" character who, if an applicant himself or herself, would never be selected. Instead, a legitimate applicant was trying to meet what it thought was a legislatively-created mandate, but what this court now finds was not. What is important is that there is nothing about any of the "Stansley entities" which the Commission needed to know that it did not know. Thus, under the narrow and unusual facts of this case only, and in spite of the fact that normally one must apply to be licensed, the court holds that the award of an operator's license to Stansley Racing Corp., even though Stansley Racing Corp. did not technically apply, was neither arbitrary nor unlawful. The award will not be disturbed.

## 2. Evidence To Support the Awards

Little need be said with regard to appellant's second issue on appeal; that is, that the evidence in the record fails to support critical findings upon which the Commission based its award. Stripped to its essentials, what appellant is really saying is that the Commission made the wrong decision. Indeed, in its briefs and oral argument to the court, as well as in its application to the Commission, appellant makes forceful and rational arguments as to why horse racing will never work in New Kent County, where Colonial Downs will be located, and can only work in northern

Virginia, where appellant would operate, specifically, Prince William County. Echoing that sentiment is the Virginia Horsemen's Association, which filed an "*amicus curiæ*" brief with the court which, though unsolicited, has been read. In fact, it is quite possible that if the court were to investigate the matter itself, either personally or through a court-appointed panel, it might fully agree that horse racing in New Kent is doomed to failure. It is just as likely, however, that the court would agree with Colonial Downs, L.P.'s, and Stansley Racing Corp.'s forceful and rational arguments, and that New Kent would be declared the only place in Virginia where horse racing has any chance at all of success. The point is that the court has neither the expertise nor inclination to decide where a horse racing track should be. More importantly, the court has no authority to decide that question. That authority — that "*plenary*" authority — is given to the Virginia Racing Commission, and to the Virginia Racing Commission alone. Only if the Commission's decision is arbitrary can it be disturbed. It will not be disturbed here.

The record in this case exceeds ten fully-packed storage boxes. The Commission's Case Decision comprises thirty-two pages. Each application is fully discussed in the Case Decision, and the precise reasons for the awards to Colonial Downs, L.P., and Stansley Racing Corp. are stated in detail. Also stated in detail are the precise reasons for denying all of the other applications. To discuss those reasons here would take more time than the court is willing to devote to this opinion and more time than the reader should be made to endure it. The court, however, has reviewed the entire record, and is satisfied that factual support for each of the Commission's decisions exists in it.

One particular matter will be noted. Appellant argues that the record fails to show that Colonial Downs, L.P., or Stansley Racing Corp. will comply with the Interstate Horse Racing Act of 1978, 15 U.S.C. § 3001 *et seq.*, which regulates the number of simulcast horse races which can be transmitted from other states into Virginia for the purpose of pari-mutuel betting. Specifically, appellant argues that compliance with the Act was a "crucial" part of the Commission's requirements and that none of the applicants could meet it, appellant being the only applicant, because of the number of days it intended to race, which was exempt from compliance. The fact is, however, that racing under the Interstate Horse Racing Act was *not* a requirement for the licenses being awarded by the Commission in

this licensing action. Instead, that is a completely separate licensing action which is only now going on. The fact that Colonial Downs was the only applicant which had begun the process, however, *was* relied on by the Commission as a reason to grant a license to it. There is nothing erroneous about such reliance.

### 3. *Secret Consideration of Evidence*

Finally, appellant argues that because the racing plan put forward by Colonial Downs, L.P., and Stansley Racing Corp. relies on the coordination of racing schedules between the Virginia licensees and the Maryland Jockey Club, which holds equivalent licenses in the State of Maryland, there must have been some sort of dispositive information which was never disclosed publicly but which was "secretly" considered by the Commission and which improperly convinced the Commission that the Colonial Downs-Stansley plan was workable. Other than several newspaper articles quoting various Virginia and Maryland racing officials, however, no facts to support such allegations have been cited. Obviously, the court cannot base its decision on such pure conjecture. This basis for the appeal is also rejected.

### *Conclusion*

For the reasons stated above, the decision of the Virginia Racing Commission which awarded licenses to Colonial Downs, L.P., and Stansley Racing Corp. will be affirmed.